UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
MEDICAL DIAGNOSTIC IMAGING, PLLC,   :
et. al.,                                 :
                                     :
                Plaintiffs,  :
                                : 06 Civ. 7764 (CLB)(THK)
      -against-              :
                                     :
CARECORE NATIONAL, LLC, et. al.,   :
                                   :
                Defendants.  :
---------------------------------------X
PARK WEST RADIOLOGY, P.C., et. al.,   :
                                   :
                Plaintiffs,  :
                                : 06 Civ. 13516 (VM)(THK)
      -against-              :
                                   :
CARECORE NATIONAL, LLC, et. al.,   :     **Memorandum**
                                   :     **Opinion and**
                                   :       **Order**
                Defendants.  :
---------------------------------------X
**THEODORE H. KATZ, United States Magistrate Judge**

    In these anti-trust cases, Plaintiffs are radiologists
alleging that Defendant CareCore National, LLC ("CareCore"),
together with member radiologists and un-named "co-conspirators",
are engaged in anti-competitive practices which have unlawfully
restricted the practice of radiology in New York City and various
counties throughout the State of New York, in violation of the
Sherman Act, 15 U.S.C. §§ 1 and 2. The cases were consolidated for
the purpose of coordinated pretrial discovery, and have been
referred to this Court for general pretrial management.

    Presently before the Court is a motion to intervene by non-

1

party radiologists, brought simultaneously with a motion and Complaint in Intervention to disqualify Plaintiffs' counsel because of alleged conflicts of interest. For the reasons stated below, the Court grants the motion to intervene and denies the motion to disqualify.

## BACKGROUND

Defendant CareCore provides diagnostic imaging utilization management services to certain major managed care health benefit plans and commercial insurers (the "health plans") across the nation and in New York. (<u>See</u> Declaration of Dr. Chang, dated Nov. 20, 2007 ("Chang Decl.") ¶ 6.) In particular, CareCore authorizes and approves particular radiologists to provide outpatient, in-office, diagnostic imaging services to patients covered and paid-for by the health plans. (<u>See</u> <u>id.</u>) CareCore thus refers the health plans' patients to its members for radiology services. Also named as Defendants are most of the member/doctors of CareCore's Management Committee.

These suits arose after Plaintiffs, diagnostic imaging practices, were denied membership in CareCore, and then sued under the antitrust laws claiming market domination by CareCore. Plaintiff Medical Diagnostic Imaging ("MDI") is represented by two law firms, Weiss & Zarrett, P.C. ("W&Z"), and Schwartz &

Thomashower LLP ("S&T").[1]  Plaintiff Park West Radiology ("Park West") is represented by a third firm, Constantine & Cannon LLP ("Constantine").  W&Z and S&T were also co-counsel in the related but now-dismissed Alpha action.[2]  Additionally, before any of the current Plaintiffs brought suit, David Zarrett ("Zarrett") of W&Z, and William Thomashower ("Thomashower"), of S&T, brought suit against CareCore on behalf of New York Medscan LLC ("Medscan action").

The MDI action was filed by W&Z and S&T in September of 2006. The Alpha action, filed by W&Z and S&T, and the Park West action, filed by Constantine,  were commenced in November of 2006.  The Medscan action was dismissed in December of 2006 pursuant to a settlement agreement.

Movants  are  radiologist  groups  affiliated  with  CareCore. Movant James Chang, M.D., FACR,[3] owns Movants CP Advanced Imaging PLLC ("CPAI"), and CP Radiology, P.C. ("CPR") (collectively "Dr.

---

[1]  Rachel Schwartz and William Thomashower are S&T's lead counsel.  At the time the MDI action was filed, Schwartz and Thomashower were partners at Kaplan, Thomashower & Landau LLP. References to S&T occasionally refer to actions taken by Schwartz and Thomashower before S&T actually existed.

[2] Alpha Imaging Consultants ("Alpha") brought suit against the same defendants as in the MDI and Park West actions, but the action was involuntarily dismissed after Alpha failed to secure new counsel following the withdrawal of W&Z and S&T as their attorneys.  (See Order, dated Dec. 17, 2007.)

[3] FACR stands for Fellow of the American College of Radiologists.

3

Chang"). CPR is no longer active, but it owns an interest in CareCore. (See Chang Decl. ¶¶ 2, 5.) CPAI is the primary entity through which Dr. Chang practices, and is a CareCore Provider. (See id. ¶¶ 2, 5, 6.) Dr. Chang sits on CareCore's Management Committee – CareCore's governing body - as well as on its Compensation Committee and Nominating/Governance Committee. (See id. ¶ 7.) Dr. Chang is also a participating doctor who receives referrals from CareCore. (See id. ¶¶ 4, 6.) Dr. Chang individually owns a profit interest in CareCore, in addition to the interests owned by CPR, his wife, and a grantor trust; CPAI does not own any interest in CareCore. (See id. ¶ 5.)

Movant Steven L. Mendelsohn, M.D., is a 40% owner of Movant Zwanger-Pesiri Radiology, LLP, and is its Medical Director (collectively referred to as "Dr. Mendelsohn"). (See Declaration of Steven L. Mendelsohn, dated Nov. 20, 2007 ("Mendelsohn Decl.") ¶ 1.) Dr. Mendelsohn is also a CareCore owner and Participant, and he sits on CareCore's Advisory Committee and its Quality Control Committee. (See id. ¶¶ 5, 7.) Neither Dr. Mendelsohn, nor Dr. Chang, are named as defendants in the MDI or Park West actions, nor were they defendants in the now-dismissed Medscan and Alpha actions.

Prior to the filing of these lawsuits against CareCore, Richard Weiss ("Weiss"), lead counsel at W&Z, represented both Dr. Chang and Dr. Mendelsohn. Specifically, Weiss represented Dr.

Chang from 2003 until sometime in 2006, handling various legal matters including, and significant to these motions, an on-going negotiation with another radiology group to form a joint-venture. (See Declaration of Richard Weiss, dated Dec. 14, 2007 ("Weiss Decl.") ¶¶ 18-20.) Weiss also represented Dr. Mendelsohn over the course of approximately fifteen years, handling various legal matters, including the acquisition of other radiology practices. (See id. ¶¶ 49, 52.) Weiss's representation of Dr. Mendelsohn continued, at a minimum, past the May 2005 filing of the Medscan action.[4] (See Mendelsohn Decl. ¶ 19.)

The Medscan action was filed by Weiss's partner, Zarrett, and Thomashower. (See Medscan Complaint, No. 05 Civ. 4653.) Around May or June of 2005, after Medscan was filed, Dr. Chang read the complaint and learned that W&Z was involved in bringing the Medscan action against CareCore and other defendants. (See Chang Decl. ¶ 17.) He also observed that he was not named as a defendant. (See id.) Dr. Chang called Weiss and asked him about the Medscan action and whether W&Z could continue to represent him if the joint-venture negotiations, which by then had become "dormant," were to be revived. (See id. ¶ 20.) According to Dr. Chang, Weiss told him that continued representation would not be a problem. (See id.) Weiss disputes that characterization of their conversation.

---

[4] As explained in more detail below, the parties disagree about the date when Weiss's representation of Drs. Chang and Mendelsohn ended.

(See Weiss Decl. ¶ 39.)

Over a year later, in November of 2006, Dr. Chang called Weiss about reviving the joint-venture negotiations. (See Chang. Decl. ¶¶ 26, 27.) At that time, Weiss told Dr. Chang that he could no longer represent him. (See id.; see also Weiss Decl. ¶ 47.) This conversation took place after the MDI action was filed and around the time that the Alpha action was filed. (See Chang. Decl. ¶ 27.) Although Dr. Chang was aware of the MDI action when he called Weiss, Dr. Chang did not attempt to intervene in the action in order to seek disqualification of W&Z from representing Plaintiffs because of a conflict of interest.

After Alpha, MDI, and Park West were filed, Plaintiffs moved to consolidate the cases for the purpose of conducting coordinated discovery. (See Plaintiff's Joint Motion to Consolidate Pretrial Proceedings, dated Mar. 23, 2007 ("Motion to Consolidate").) CareCore unsuccessfully opposed the motion, but in doing so made no reference to any possible conflict of interest, despite being aware that W&Z had represented Dr. Chang - a CareCore board member. (See CareCore Defendant's Memorandum of Law Opposing Plaintiff's Joint Motion to Consolidate Pretrial Procedures, dated Apr. 12, 2007 ("Opposition to Mot. to Consolidate"); Weiss Decl. ¶ 43.) Movants, as well, did not seek to intervene in these actions at that time.

In July of 2007, in the course of pretrial discovery, Constantine, on behalf of all Plaintiffs, issued subpoenas duces

tecum to Movants seeking documents related to their involvement with CareCore. (<u>See</u> Declaration of Peter Chavkin, dated Nov. 21, 2007 ("Chavkin Decl.") ¶ 2.) Movants retained separate counsel and notified Plaintiffs' attorneys that they believed that W&Z had a conflict of interest. (<u>See id.</u> ¶ 6.) In September 2007, Movants served objections to the subpoenas and formally raised the issue of disqualification. (<u>See id.</u> ¶ 8.) On October 30, 2007, at a conference before this Court, Movants notified the Court that they would seek to intervene to disqualify Plaintiffs' attorneys, which they did soon thereafter.

Movants seek to disqualify W&Z from representing Plaintiffs based on alleged violations of New York's Code of Professional Responsibility's Disciplinary Rules ("New York's Code"), Canons 4, 5, and 9. Those Canons prohibit an attorney from taking adverse action against a current or, under certain circumstances, a former client. Movants, who are CareCore owners and Participants, base their disqualification claim on Weiss's earlier representation of Movants, the subpoenas issued to Movants, as well as language in the Complaints alleging that CareCore Committee Members, acting as unnamed co-conspirators, are engaging in unlawful anti-trust activities. Movants further claim that as a result of the close relationship and coordination of discovery between W&Z and their co-counsel, S&T, S&T should also be disqualified. Finally, Movants request limited discovery to determine if Constantine should

similarly be disqualified. CareCore joins Movants in seeking disqualification of all three firms.

**DISCUSSION**

I. <u>Motion to Intervene</u>

Movants seek to intervene, as a matter of right, pursuant to Federal Rule of Civil Procedure 24, in order to bring their motion to disqualify.[5] In support of their motion, Movants assert that they have two interests in the current litigation which justify intervention. First, Movants argue they are referred to in the complaints as unnamed co-conspirators, and, as a result, Movants argue that they stand accused of illegal actions which could expose them to civil or criminal liability. Second, Movants assert a more generalized interest in conflict-free representation and in the preservation of confidences. Movants specifically disavow an economic interest in their motion to disqualify, and do not claim an economic interest in the outcome of these actions. (<u>See</u> Reply

---

[5] Movants' notice of motion makes reference to intervention pursuant to Federal Rule of Civil Procedure 24(a) and (b), but they have focused their arguments on Rule 24(a) - providing for intervention as of right. Overall, however, the parties devote little attention to the issue of intervention. In particular, Plaintiffs' attorneys devote approximately two pages, in a thirty-eight page memorandum, opposing the motion to intervene. (<u>See</u> Joint Memorandum of Law in Opposition to Motion for Disqualification, at 37-38.) Movants devote approximately three pages total to the issue, between their opening and reply briefs. (<u>See</u> Movants' Memorandum of Law to Intervene for the Purpose of Disqualifying Plaintiff's Counsel Because of Conflicts of Interest ("Motion to Intervene"), at 14-16; Reply Memorandum of Law by Movants ("Movants' Reply"), at 17-18.)

Memorandum, at 18 ("At stake for Movants on their motion are the interests protected by Canons 4, 5, and 9, not money. . . .") (emphasis added).)

To intervene pursuant to Federal Rule of Civil Procedure 24(a): "an applicant must (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." R Best Produce, Inc. v. Shulman-Rabin Marketing Corp., 467 F.3d 238, 240 (2d Cir. 2006) (quoting In re Bank of New York Derivative Litig., 320 F.3d 291, 300 (2d Cir. 2003)) (internal quotation marks omitted); see also Fed. R. Civ. P. 24(a); Mastercard Int'l Inc. v. Visa Int'l Serv. Assoc., Inc., 471 F.3d 377, 389 (2d Cir. 2006); Brennan v. New York City Bd. of Educ., 260 F.3d 123, 128-29 (2d Cir. 2001). "Failure to satisfy any one of these [four] requirements is a sufficient ground to deny the application." R Best Produce, 467 F.3d at 241 (quoting In re Bank of N. Y., 320 F.3d at 300) (internal quotation marks omitted). That is not to say, however, that denial of intervention is mandatory if one element is not met. See Cole Mechanical Corp. v. National Grange Mut. Ins. Co., No. 06 Civ. 2875 (LAK) (HBP), 2007 WL 2593000, *2 (S.D.N.Y. Sept. 7, 2007) (noting that the test is flexible and courts generally look at all four factors rather than focusing narrowly on any one). Whether a party may intervene is left to the

Court's sound discretion.  See Brennan, 260 F.3d at 128.

A.  Timeliness

When a would-be intervenor knew or should have known that it has an interest in the litigation is an important factor in determining whether a motion to intervene is timely.  See Brennan, 260 F.3d at 128-29; Butler, Fitzgerald & Potter v. Sequa Corp. 250 F.3d 171, 182 (2d Cir. 2001).  Timeliness is evaluated in light of the totality of the circumstances.  See Farmland Dairies v. Comm'r of New York State Dep't of Agriculture and Markets, 847 F.2d 1038, 1044 (2d Cir. 1988)  (citing NAACP v. New York, 413 U.S. 345, 366, 93 S. Ct. 2591, 2603 (1973)).

Dr. Chang's motion to intervene is not timely.  The MDI action was filed in September of 2006 and closely resembles the previously filed Medscan action.  (See Ex. R annexed to Chavkin Decl., chart comparing the Medscan action to the MDI action.)  Because Dr. Chang read the Medscan Complaint, which accused him of being an unnamed co-conspirator in May of 2005,[6] at the time the MDI action was filed, he should have know he is being accused of essentially the same thing in these actions.  As a CareCore board member, he was

_____

[6] The language used in the Complaint is not particularly complicated, especially for a well-educated doctor, and would not require legal training to understand.  (See, e.g., Medscan Complaint, No. 05 Civ. 4653, ¶ 6, "Other members of the [CareCore] Board have combined and conspired with the above-named [CareCore] Board members to further their independent stake and interests to the detriment of free and open competition in the market . . ..")

presumably made aware of the filing of these lawsuits against CareCore, as he was when Medscan was filed.

In any event, in November of 2006, when Dr. Chang called Weiss, Chang knew of the MDI action. At that time, Weiss declined to represent Dr. Chang with regard to transactional work, "under the circumstances." This should have put Dr. Chang on notice of a possible conflict between his interests and Weiss's interests. Thus, as of November of 2006, Dr. Chang knew or should have known of all the interests he now claims to have in this litigation. Seeking intervention nearly a year later, after CareCore opposed a motion to consolidate with no mention of a possible conflict of interest,[7] and after substantial pretrial discovery has already taken place, is not, in the Court's view, timely. See United States v. Pitney Bowes, Inc., 25 F.3d 66, 70 (2d Cir. 1994) (holding that a party seeking to intervene had constructive knowledge for fifteen months and actual knowledge for eight months and thus motion was untimely); Farmland Dairies, 847 F.2d at 1044 (finding intervention untimely after seventeen-month delay and after the parties reached settlement agreement); Butler, Fitzgerald, 250 F.3d at 182 (finding one year delay and late stage

_____

[7] CareCore failed to alert the Court to W&Z's possible conflict of interest at the time it opposed the motion to consolidate. Yet, CareCore knew of the possible conflict. (See Weiss Decl. ¶ 43.) The fact that Movants had a stronger interest in the alleged conflict should not have deterred CareCore from bringing the issue to the Court's attention at a critical juncture in this litigation.

of litigation rendered motion to intervene untimely); see also Hnot
v. Willis Group Holdings Ltd., No. 01 Civ. 6558(GEL), 2006 WL
3476746, at *4 (S.D.N.Y. Nov. 30, 2006) (finding fourteen-month
delay in filing a motion to intervene untimely); In re Bank of New
York Derivative Lit., 173 F. Supp. 2d 193, 201 (S.D.N.Y. 2001)
(holding that seeking intervention in a well-publicized lawsuit,
pending for more than two years, was untimely).

However, there is no evidence that Dr. Mendelsohn was aware of
this litigation, and the interests he now asserts, until July of
2007, when he received the subpoenas and met with his current
counsel.  Therefore, Dr. Mendelsohn's attempt to intervene a few
months later is timely.

    B.  Substantial or Direct Interest

    To intervene, a party must also show an interest in the
action.  See R Best Produce, 467 F.3d at 240.  "For an interest to
be cognizable under Rule 24(a)(2), it must be 'direct, substantial,
and legally protectable.'"  Brennan, 260 F.3d at 129 (quoting
Washington Elec. Coop., Inc. v. Massachusetts Mun. Wholesale Elec.
Co., 922 F.2d 92, 97 (2d Cir. 1990)).  "An interest that is remote
from the subject matter of the proceeding, or that is contingent
upon the occurrence of a sequence of events before it becomes
colorable, will not satisfy the rule."  Washington Elec., 922 F.2d
at 97; accord Brennan, 260 F.3d at 129.

    Here, Movants appear to have limited, contingent, and indirect

interests in this litigation.  First, Movants are not parties in any litigation connected to these actions.[8]  While not dispositive, Movants indirect connection to this case is an important factor in considering the strength of Movants' motion to intervene.  See Leber Assoc., LLC v. The Entertainment Group Fund, Inc., No. 00 Civ. 3759, 2001 WL 1568780, at *7 (S.D.N.Y Dec. 7, 2001) (noting that non-party status was a reason to reject a motion to disqualify); see also Compangnie Noga D'Importation et D'Exportation S.A. v. The Russian Federation, No. 00 Civ. 632 (WHP), 2005 WL 1690537 (S.D.N.Y. July 20, 2005) (denying intervention to a non-party to the current and underlying actions).

Second, as unnamed co-conspirators, Movants are not subject to contribution liability if CareCore is found to have violated the Sherman Act.  See generally Texas Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 101 S. Ct. 2061 (1981) (holding the Sherman Act does not authorize contribution liability for conspirators); see also Getty Petroleum Corp. v. Island Transp. Corp., 862 F.2d 10, 16 (2d Cir. 1988) (noting there is no federal common law of contribution).  There has also been no argument that CareCore could seek indemnification from Movants.  Indeed, Movants have not asserted an economic interest in the outcome of this

_____

[8] See, e.g., Enzo BioChem, Inc. v. Applera Corp., 468 F. Supp. 2d 359, 361 (D. Conn. 2007) (finding involvement in a separate, but closely related case justified intervention, for purposes of bringing a motion to disqualify in the case in which the movant was a non-party).

litigation. Thus, the mere claim that Movants are unnamed co-conspirators does not give rise to a substantial or direct interest in the litigation.

Nonetheless, Movants also assert an interest in conflict-free counsel and the preservation of their confidences. More specifically, Movants argue they have three protectable interests implicated by W&Z's representation of MDI: (1) to prevent a "continuing" violation of W&Z's duty of undivided loyalty; (2) protection of confidential disclosures and misuse of their confidential information; (3) prevention of further unauthorized disclosures. (See Motion to Intervene, at 16.)

A determination of whether these interests are substantial or direct requires an examination of the underlying merits of Movants' motion to disqualify. However, the Second Circuit has cautioned that a motion to intervene "cannot be resolved by reference to the ultimate merits of the claims which the intervenor wishes to assert following intervention. . . ." Brennan, 260 F.3d at 129 (quoting Oneida Indian Nation v. New York, 732 F.2d 261, 265 (2d Cir. 1984)). Rather, a motion to intervene only "turns on whether the applicant has demonstrated that its application is timely, that it has an interest in the subject of the action, that disposition of the action might as a practical matter impair its interest, and that representation by existing parties would not adequately protect that interest." Id.

With respect to the second factor, Movants' interest in conflict-free counsel, as protected by Canons 4, 5, and 9, though substantial, is nonetheless only indirectly related to the anti-trust issues raised in these cases. Furthermore, the third factor, whether Movants' interests may be impaired by the disposition of the action, also weighs against Movants. Any alleged violation of Canons 4, 5, or 9, has already occurred; thus, the resolution of the anti-trust issues in these cases would not further impair Movants' interest in their former attorney's adherence to those Canons.[9] Therefore, if the Court were to strictly apply the requirements for intervention, it would be difficult to conclude that Movants satisfied them.

However, a strict application of the intervention rules, in light of a colorable assertion that ethical considerations may warrant disqualification of counsel, should not prevent the Court from examining the merits of such a claim. The rules governing intervention are better suited to addressing whether outside parties may intervene to assert substantive claims, rather than allegations which implicate the integrity of the adversarial process - a process the Court has an obligation to protect. Therefore, in light of the discretion district courts have in

_____

[9] As for the fourth factor, the confidences at issue are Movants' and not CareCore's. The Court is therefore satisfied that neither CareCore, nor another party, would adequately represent Movants' interests.

ruling on intervention, see Fed. R. Civ. P. 24(b)(2), and the flexible nature of the rules governing intervention, see Cole Mechanical, 2007 WL 2593000, at *2, and the Court's interest in protecting the adversarial process, the Court concludes that Movants should be permitted to intervene for the limited purpose of reaching the merits of their motion to disqualify. See Tachiona ex rel. Tachiona v. Mugabe, 186 F. Supp. 2d 383, 395-96 (S.D.N.Y. 2002) (noting that "where a case implicates substantial and important issues of public law, the interest requirement may be applied less rigidly" (citing Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 87 S. Ct. 932 (1967)); see also Cole Mechanical, 2007 WL 2593000, at *4 (permitting intervention by a non-party seeking to disqualify plaintiff's attorneys); cf. Leber Assoc., 2001 WL 1568780, at *1 (allowing a party to bring a motion to disqualify on behalf of a non-party).

## II. Motion to Disqualify

Federal courts have the inherent power to disqualify attorneys in order to "preserve the integrity of the adversar[ial] process." Hempstead Video, Inc., v. Inc. Village of Valley Stream, 409 F.3d 127, 132 (2d Cir. 2005) (citation omitted). "In a technical sense the only truly binding authority on disqualification issues is [Second] Circuit precedent, because our authority to disqualify an attorney stems from the Court's inherent supervisory authority." Skidmore v. Warburg Dillon Read LLC, No. 99 Civ. 10525 (NRB), 2001

WL 504876, at *2 (S.D.N.Y. May 11, 2001). Although federal courts often look to state disciplinary rules for guidance, "such rules merely provide general guidance and not every violation of a disciplinary rule will necessarily lead to disqualification." Hempstead Video, 409 F.3d at 132. In deciding whether to disqualify counsel, a court must balance "the need to maintain the highest standards of the profession" against "a client's right freely to choose his counsel." Hempstead Video, 409 F.3d at 132 (citations omitted).

Disqualification is generally sought in two kinds of cases. See Bd. of Educ. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979). First, disqualification is merited if an attorney's concurrent representation of two clients undermines the court's confidence in the attorney's loyalty to his clients, in violation of Canon 5 of New York's Code ("Canon 5").[10] See id. Second, disqualification

---

[10] Canon 5 commands: "A lawyer should exercise independent judgment on behalf of a client." Nyquist, 590 F.2d at 1246 n.6. The corresponding New York State Disciplinary Rule reads:

> A lawyer shall not accept or continue employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests, unless a disinterested lawyer would believe that the representation of the client will not be adversely affected thereby and the client consents to the representation after full disclosure of the implications of the lawyer's interest.

Code of Prof. Resp., DR 5-101, 22 N.Y. Comp. Codes R. & Regs. § 1200.20 (McKinney's 2008).

may be necessary if the attorney is actually or potentially in a position to use privileged information gained from a former client to the advantage of a current client, in violation of Canon 4 of New York's Code ("Canon 4") protecting client confidences.[11]  See id.  Finally, Canon 9 of New York's Code ("Canon 9") – barring attorneys from actions that give the appearance of impropriety – is also invoked in conjunction with other Canons, but is rarely a separate ground for disqualification.[12]  See Nyquist, 590 F.2d at 1247 ("[The] appearance of impropriety is simply too slender a reed on which to rest a disqualification order except in the rarest cases.").  Conduct that is serious enough to justify disqualification is conduct that "tends to taint the underlying trial by disturbing the balance of the presentations in one of the two ways indicated above."  Id. at 1246 (internal quotation marks

---

[11] Canon 4 commands: "A lawyer should preserve the confidences and secrets of a client."  The corresponding New York State Disciplinary Rule reads:

> Except when permitted under DR 4-101(C) [e.g., when the client consents], a lawyer shall not knowingly: (1) Reveal a confidence or secret of his client. (2) Use a confidence or secret of his client to the disadvantage of the client. (3) Use a confidence of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

Code of Prof. Resp., DR 4-101(B), 22 N.Y. Comp. Codes R. & Regs. § 1200.19 (McKinney's 2008); see also Evans v. Artek Systems Corp., 715 F.2d 788, 791 (2d Cir. 1983).

[12] See Code of Prof. Resp., DR 9-101, 22 N.Y. Comp. Codes R. & Regs. § 1200.45 (McKinney's 2008).

and citation omitted).

Unless there is a risk of taint to a court proceeding, courts are quite hesitant to disqualify an attorney from representing his client in litigation. See id.; see also In Re MTBE Prod. Liab. Litig., 438 F. Supp. 2d 305, 309 (S.D.N.Y. 2006) (finding no taint, denying motion to disqualify); DeVittorio v. Hall, No. 07 Civ. 812 (WCC), 07 Civ. 1956 (WCC), 2007 WL 4372872 (S.D.N.Y. Dec. 12, 2007) (denying motion to disqualify brought against plaintiff's attorney who represented a defendant in a similar matter). "Courts are reluctant to grant such motions because they are often tactically motivated . . . and have an immediate adverse effect on the client by separating him from counsel of his choice." D.R.T., Inc. v. Universal City Studios, Inc., 02 Civ. 0958(BSJ)(JCF), 2003 WL 1948798, at *2-3 (S.D.N.Y. Apr. 24, 2003) (internal quotation marks and citations omitted). Finally, courts are also reluctant to grant motions to disqualify because they inevitably result in delay and added expense. Cole Mechanical, 2007 WL 2593000, *4 (citing Evans v. Artek Sys. Corp., 715 F.2d 788, 791 (2d Cir. 1983)).

A.  Canon 5 - Concurrent Representation

Movants argue that W&Z violated Canon 5 and the rules set forth in Cinema 5 Ltd v. Cinerama, Inc., 528 F.2d 1384 (2d Cir. 1976), because Weiss had been representing them at the same time W&Z was representing the plaintiffs in the Medscan action.

19

Furthermore, Movants argue that because Weiss's representation of Movants may have continued after the Alpha and MDI actions were filed, by representing MDI in these actions, where Movants are unnamed co-conspirators of Defendant CareCore, W&Z is conflicted and should be disqualified.

Cinema 5 held that "[w]here the [attorney-client] relationship is a continuing one, adverse representation is _prima facie_ improper. . . ." 528 F.2d at 1387; _see also_ Hempstead Video, 409 F.3d at 133. W&Z denies that it was representing Movants at the time that MDI was filed. A threshold issue, therefore, is whether a continuing attorney-client relationship existed between Weiss and Movants when MDI was filed.[13] _See_ Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 748-49 (2d Cir. 1981); _see also_ DeVittorio, 2007 WL 4372872 at *7 (finding no attorney-client relationship at the time of the alleged breach of Canon 5 and denying motion to disqualify on that basis).

Courts in the Southern District of New York have identified six factors relevant to determining whether an attorney-client relationship exists. _See_ First Hawaiian Bank v. Russell & Volkening, Inc., 861 F. Supp. 233, 238 (S.D.N.Y. 1994). The six factors considered are: "1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer

_____

[13] MDI is the only case out of which an alleged violation of Canon 5 could arise. Medscan and Alpha have been dismissed, and Park West was not filed by W&Z.

agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously; 4) whether the attorney actually represented the individual in one aspect of the matter (e.g., at a deposition); 5) whether the attorney excluded the individual from some aspect of a litigation in order to protect another (or a) client's interest; 6) whether the purported client believes that the attorney was representing him and whether this belief is reasonable." Id. at 238 (citing Keoseian v. Von Kaulbach, 707 F. Supp. 150, 152 (S.D.N.Y. 1989) and Kubin v. Miller, 801 F. Supp. 1101, 1115 (S.D.N.Y. 1992)) (internal citations omitted); see also Ello v. Singh, No. 05 Civ. 9625, 2006 WL 2270871, at *3 (S.D.N.Y. Aug. 7, 2006) (noting the same six factors).

As an initial matter, the Court rejects Movants' argument that ethical and fiduciary violations which may have occurred while the Medscan action was pending provide a separate basis for disqualification in the current actions.[14] Although it appears that Weiss did provide legal services to Movants during the pendency of the Medscan litigation, those services were in no way related to

---

[14] Movants rely primarily on Canon 9 - avoidance of the appearance of impropriety - to support their argument that concurrent adverse representation, while the Medscan action was pending, should be grounds for disqualification in these cases. However, as has already been noted, Canon 9 is rarely sufficient to justify disqualification, and it is not sufficient here.

Medscan or its litigation.[15]  Moreover, there is no indication that Movants' interests were compromised while the Medscan action was pending; nor is there any evidence that W&Z's representation of Movants compromised the Medscan plaintiffs' interests.  In short, Weiss's brief representation of Movants during the pendency of the Medscan litigation is not a sufficient basis to justify disqualification in these actions.  See Cinema 5, 528 F.2d at 1387 (noting that if there is concurrent representation, disqualification is not required if the attorney shows no diminution in the vigor of his representation of either client).

However, determining whether Weiss had an attorney-client relationship with Dr. Chang or Dr. Mendelsohn after MDI was filed is not so straight-forward.  Weiss had a different relationship with each doctor, and thus each must be evaluated separately.

### 1) Dr. Chang

In 2003, Dr. Chang entered into a retainer agreement with W&Z, so that Weiss could provide legal representation during Dr. Chang's joint-venture negotiations with another radiologist.[16]  (See Chang. Decl. ¶ 10; Ex. A annexed to Chang Decl.)  Dr. Chang asserts that

---

[15] He represented Dr. Mendelsohn's practice in negotiating an employment contract with a new doctor in March of 2006.  (See Mendelsohn Decl. ¶ 21.)  It was the last service he provided to Dr. Mendelsohn.  (See id.)  Additionally, in June, 2005, Dr. Chang and Weiss spoke on the phone about the Medscan action, and Weiss billed Dr. Chang for that call.  (See Weiss Decl. ¶ 36.)

[16]  That agreement also states that it applies "to any future matters. . . ."  (Ex. A annexed to Chang Decl.)

during the time that Weiss was working on the joint-venture negotiations, CareCore, and its financial importance to Dr. Chang's practice, was discussed. (See Chang Decl. ¶ 15.) Dr. Chang claims that he explained to Weiss the benefits of being a CareCore provider and member, the importance of geography to CareCore, and CareCore's reimbursement policies, procedures, and history. (See id.) Dr. Chang shared this information to explain how CareCore membership would affect the proposed joint-venture he was pursuing. (See id.) It appears that most of these conversations occurred prior to 2005.

Dr. Chang admits that the joint-venture negotiations were "dormant" from 2005 until late in 2006. (Chang Decl. ¶ 23.) Sometime around November of 2006, the same time period as when the Alpha and MDI actions were filed, Dr. Chang called Weiss about re-starting the joint-venture negotiations. (See id. at 26.) Although both parties agree that Weiss declined to continue to represent Dr. Chang in the joint-venture negotiations, Weiss's and Dr. Chang's memories differ somewhat about the substance of their conversation. (Compare Weiss Decl. ¶ 47, with Chang. Decl. ¶ 27.)

Weiss asserts that he provided no further services to Dr. Chang with regard to the joint-venture negotiations, after March 31, 2005, because the deal died. (See Weiss Decl. ¶¶ 19, 20.) The billing invoices provided by Weiss support his view; they indicate that the last legal work done by Weiss for Dr. Chang was on

November 2, 2005.  (See Ex. B annexed to Weiss Decl.)  Weiss was
therefore surprised that Dr. Chang called him in late 2006
regarding further representation.  (See Weiss Decl. ¶ 47)  Weiss
was surprised because when Dr. Chang called him in June of 2005, he
explained that although he could continue to represent him, he did
not think it would be a good idea because the parties who were
involved in the joint-venture negotiations were also involved in
the Medscan action.  (See id. ¶ 39.)  The Medscan litigation
created tension between Weiss and the attorneys representing the
other party to the joint-venture negotiations.  (See id. ¶ 40.)
Therefore, Weiss did not believe that he would be the most
effective advocate for Dr. Chang in the joint-venture negotiations.
(See id.)  Nevertheless, he did not view his firm's representation
of the Medscan plaintiffs as adverse to Dr. Chang.  (See id. ¶¶ 39,
40.)  Thus, he believed there was no ethical conflict, but that he
would not be the most effective advocate for Dr. Chang if the
joint-venture negotiations were to resume.  (See id. ¶ 41.)

Weiss left the June 2005 conversation with Dr. Chang with the
understanding that his representation of Dr. Chang was over.  (See
id. ¶ 42.)  When Dr. Chang called in late 2006, Weiss was
surprised; he reiterated what he had said in June of 2005, and
suggested that Dr. Chang obtain different counsel.  (See id. ¶ 47.)

Dr. Chang has a less specific memory of both the June 2005 and
November 2006 conversations.  Dr. Chang remembers that in the June

2005 conversation, Weiss was apologetic about the Medscan action, that Weiss said he was not involved with its filing, and that Weiss indicated that he could continue to represent him. (See Chang Decl. ¶ 20.) Dr. Chang continued to subjectively believe that Weiss represented him, until Weiss told him in November of 2006 that he could not continue to represent him in the joint-venture negotiations "under the circumstances." (See id. ¶ 27.)

*  *  *

"Disqualification will ordinarily be required whenever the subject matter of a suit is sufficiently similar to the scope of the matters [of the prior representation] as to create a realistic risk either that the [movant] will not be represented with vigor or that unfair advantage will be taken of the defendant." Glueck, 653 F.2d at 750. Dr. Chang has not met the strict standards required to show that W&Z violated Canon 5.

First, Canon 5 is meant to guard against conflicts which threaten the ability of an attorney to exercise his judgment free from compromising influences. See Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F. 2d 225, 233 (2d Cir. 1977). At the time that the Alpha and MDI actions were filed, W&Z was not actively representing Dr. Chang in any specific matter. Though there was an old retainer agreement, Weiss was not "on retainer" in the sense that he was performing on-going legal work for Dr. Chang that was drawing down on money paid as a retainer fee. Rather, as Dr. Chang

concedes, the joint-venture negotiations, which Dr. Chang had retained W&Z to handle, were "dormant" for a significant length of time. Because Weiss was not representing Dr. Chang between November 2005 and November 2006 on any matters, there were no matters on which Weiss's judgment could have been compromised.

While it is understandable that Dr. Chang would turn to Weiss when he decided that he wanted to resume the joint-venture negotiations, there is no basis to conclude that Weiss was actually representing him during the period leading up to the 2006 conversation. Thus, for the purposes of disqualification, the retainer agreement is not a sufficient basis to establish an attorney-client relationship between Dr. Chang and Weiss at the time that the MDI action was filed. See Gluek, 653 F.2d at 749 (noting that disqualification is justified only when "the risks against which Canon 5 guards" will inevitably arise as a result of the concurrent representation).

Moreover, this is not a situation where a current client was dropped like a "hot potato" in favor of a newer, "better," client. In 2005, Weiss had no reason to believe that the joint-venture negotiations would revive or that he would continue to represent Dr. Chang.[17] At the time the current actions were filed, in 2006,

---

[17] While the filing of Medscan may have implicated Weiss's duty of loyalty to Dr. Chang, because its filing compromised his ability to effectively represent Dr. Chang during future joint-venture negotiations - as Weiss admitted to Dr. Chang during the 2005 call - when the Medscan action was filed, there was little

Weiss had even less reason to believe he would continue to represent Dr. Chang.

These facts, and the absence of any other evidence that points to an attorney-client relationship, lead the Court to conclude that Dr. Chang was not a current client of W&Z at the time the MDI action was filed. Thus, there is no basis to conclude that, under Canon 5, W&Z should be disqualified from representing MDI. See Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano, 376 F. Supp. 2d 426, 428 (S.D.N.Y. 2005) (noting the "high standard of proof" needed to disqualify counsel) (citing Evans v. Artek Sys. Corp., 715 F.2d 788, 791 (2d Cir. 1983)); see also Government of India v. Cook Industries, Inc., 569 F.2d 737, 739 (2d Cir. 1978) (same).

### 2. Dr. Mendelsohn

Weiss began representing Dr. Mendelsohn in 1992, when Weiss provided transactional services with respect to Mendelsohn's acquisition of another practice - Movant Zwanger-Pesiri. (See Mendelsohn Decl. ¶ 8.) After the acquisition, Weiss continued to represent Dr. Mendelsohn on various matters, but without any formal agreement. (See id. ¶ 9.) From 2002 until 2005, Weiss performed only occasional work for Dr. Mendelsohn, mostly related to the

---

to indicate that those negotiations would be revived. (See Weiss Decl. ¶ 42 (describing the June 2005 conversation vis-a-vis the Medscan action's effect on the joint-venture negotiations as "academic").)

acquisition of other practices or in negotiating contracts. (See id. ¶¶ 12-19.) In March of 2006, Weiss represented Zwanger-Pesiri, and a doctor new to the practice, in negotiating that doctor's employment agreement with Zwanger-Pesiri. (See id. ¶ 21.) March 28, 2006 was the last time that Weiss did formal legal work for Dr. Mendelsohn. (See Ex. C annexed to Weiss Decl.)

Dr. Mendelsohn explains that he considered Weiss to be his "general counsel" until July of 2007. (See Mendelsohn Decl. ¶ 22.) Dr. Mendelsohn asserts that from April 2005 to February 2006, he discussed CareCore with Weiss during negotiations to acquire another practice. (See id. ¶¶ 19, 20.) He contends that he explained the importance of geography and location to CareCore when it considers approval of new members, and that Weiss specifically asked questions about CareCore. (See id.) Dr. Mendelsohn does not indicate whether any of the information he provided to Weiss about CareCore was confidential or non-public information, but asserts that he expected it would be kept confidential. (See id. ¶ 22.)

Weiss describes the work he performed for Dr. Mendelsohn over the years as "discrete," and disputes that he was "general counsel" to Dr. Mendelsohn. (See Weiss Decl. ¶¶ 52, 56.) His billing records show that work was billed as it was performed. (See Ex. F annexed to Weiss Decl.)

Weiss also disputes that he received any specific information regarding CareCore or its practices as part of the legal work he

did for Dr. Mendelsohn, and he specifically denies asking any questions about CareCore. (See id. ¶¶ 49, 54, 55.) Weiss did not know that Dr. Mendelsohn was an owner or committee member of CareCore. (See id. ¶ 49.) He also did not perform any work related to Dr. Mendelsohn's involvement with CareCore. (See id.) According to Weiss, his files and notes relating to the work he performed for Dr. Mendelsohn do not contain any references to CareCore. (See id. ¶ 51.)

**\*  \*  \***

Only one of the six relevant factors suggests that an attorney-client relationship existed between Weiss and Dr. Mendelsohn at the time that MDI was filed – Dr. Mendelsohn's subjective belief that Weiss was his attorney. Dr. Mendelsohn points to his long-term working relationship with Weiss as grounds for considering Weiss to be his "general counsel." However, Weiss was never paid a retainer to be available to Dr. Mendelsohn when needed, and there is no evidence of a written agreement requiring Weiss to remain available to Dr. Mendelsohn to provide legal services. Rather, Dr. Mendelsohn paid Weiss after being billed for discrete, completed work.

If it were not for their fifteen-year history, it would be clear that no attorney-client relationship existed between Weiss and Dr. Mendelsohn after March of 2006. The earlier work Weiss did perform was on an as-needed basis, and Dr. Mendelsohn was billed

only for the work related to those discrete matters.  Furthermore, Weiss performed no work for Dr. Mendelsohn whatsoever for the eight months prior to the filing of the MDI action.  Although it may have been reasonable for Dr. Mendelsohn to believe that he could turn to Weiss for future legal work, performing discrete legal work in the past did not mean that Weiss had agreed to serve for an indefinite period of time into the future as Dr. Mendelsohn's "general counsel."  See Catizone v. Wolff, 71 F. Supp. 2d 365, 371 (S.D.N.Y. 1999) ("The fact that an individual has previously been represented by an attorney does not mean that that attorney represents that person for any or all subsequent, unrelated . . . matters.") (quoting Heine v. Colton, Hartnick, Yamin & Sheresky, 786 F. Supp. 360, 366 (S.D.N.Y. 1992)).

As with Dr. Chang, these facts lead the Court to conclude that no attorney-client relationship existed between Weiss and Dr. Mendelsohn at the time the MDI action was filed.  Without an attorney-client relationship, the interests protected by Canon 5 were not implicated when W&Z filed the MDI action.  Therefore, the Court concludes that Plaintiffs' attorneys should not be disqualified from representing MDI on the basis of Canon 5.  See Evans, 715 F.2d at 791; Government of India, 569 F.2d at 739.

B.  Canon 4 - the Duty to Protect Client Confidences

Movants also argue that Plaintiffs' attorneys should be disqualified under Canon 4 because Weiss may use their confidences,

learned during his prior representation, to the advantage of W&Z's clients in the current litigation.

"An attorney may be disqualified from representing a client in a particular case if (1) the moving party is a former client of the adverse party's counsel; (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client." Evans v. Artek Systems Corp., 715 F.2d at 791 (citing Cheng v. GAF Corp., 631 F.2d 1052, 1055-56 (2d Cir. 1980), judgment vacated on other grounds, 450 U.S. 903, 101 S. Ct. 1338 (1981)); see also Hempstead Video, 409 F.3d at 133. Additionally, the Court must be concerned with trial taint, i.e., the possibility that one party may gain an unfair advantage at trial. See Nyquist, 590 F.2d at 1246; see also DeVittorio, 2007 WL 4372872, at *9.

The first and third elements of this test are not seriously disputed. Although W&Z argues that Movants, because they are not parties, are not "adverse parties," Movants were Weiss's former clients at the time that the current actions were filed and the Court has permitted Movants to intervene to assert a motion adverse to Plaintiffs' interests. Additionally, although Weiss states he received no confidential information about CareCore, he did receive

Movants' confidential information during the course of his representation. Thus, the issues that are truly in contention are (1) whether there is a substantial relationship between the services Weiss provided to Movants and the issues in this litigation; and (2) whether any of the information Weiss had access to would taint the underlying litigation by disturbing the balance of the presentations. <u>See</u> <u>Evans</u>, 715 F.2d at 791; <u>Nyquest</u>, 590 F.2d at 1246.

### 1.  <u>Substantial Relationship Test</u>

Courts will grant disqualification based on Canon 4, only upon a showing that the relationship between the issues in the prior representation and present cases are substantially related. <u>See</u> <u>Government of India</u>, 569 F.2d at 739-40.  To be substantial, the relationship must be "patently clear," and the issues involved must be "identical" or "essentially the same". <u>See</u> <u>id.</u>; <u>Leber Assoc.</u>, 2001 WL 1568780, at *6.  If witnesses, testimony, and other evidence germane to one action are likely to be similar to the other, the issues may be substantially similar.  <u>See</u> <u>Red Ball Interior Demolition Corp. v. Palmadessa</u>, 908 F. Supp. 1226, 1244 (S.D.N.Y. 1995).

Movants assert that the evidence germane to Weiss's prior transactional work is now being sought as germane to the current actions.  Movants rely on <u>U.S. Football League v. National Football League</u>, 605 F. Supp. 1448, 1460 (S.D.N.Y 1985) (hereinafter

"USFL"), for the proposition that if facts necessary for the former representation are necessary to the present representation, then there is a substantial relationship and Plaintiffs' attorneys should be disqualified.

USFL was an anti-trust case in which the USFL (the plaintiff) was seeking disqualification of the defendant's attorneys because they had also represented the USFL during its creation. See id. The court in USFL noted that, in the anti-trust context, if the movant's market behavior is important to the litigation, then background knowledge about the movant's finances becomes relevant. See id. However, the court in USFL also recognized that "knowledge of a former client's financial and business background is not in itself a basis for disqualification if the client's background is not in issue in the later litigation." Id. at 1460 (describing Finkelstein v. Chock Full O'Nuts Corp., 82 Civ. 6725 (S.D.N.Y. 1985) (not reported)).

In USFL, when the Paul, Weiss firm was working for the USFL and helping to organize it, it had full access to, and knowledge of, the USFL's finances and structure. See 605 F. Supp. at 1460. Its work dealt with matters such as potential sources of capital, the structure of the putative league, and playing facilities. See id. Each of those matters bore directly on the USFL market structure. See id. Those matters were also relevant to the issues of causation and damages when the USFL brought suit against the

33

NFL, alleging anti-trust violations. See id. Paul, Weiss was then defending the NFL against the USFL's allegations that the NFL created a market structure that precluded competition. See id. Thus, Paul, Weiss's representation of the NFL, and its defense of the NFL's market structure, directly implicated the USFL's market structure. The court found that the significant overlap between Paul, Weiss's prior work for the USFL and the litigation against the NFL made it "clear that the services Paul, Weiss rendered to USFL [were] substantially related to [the current] litigation." Id. Because the same key factual matters were relevant to the former and current representations, Paul, Weiss had to be disqualified. See id. at 1460 n.26, 1461.

The Court does not find a significant overlap between the facts and issues significant to Weiss's prior representation of Movants and the current litigation. First, Defendant CareCore's market behavior is the subject of Plaintiffs' complaints. Movants' finances and their attempts to acquire or join with other practices, are not directly at issue in the current litigation.[18] Movants' market behavior was also not a factual matter addressed by Weiss's prior representation. Weiss's prior representation was

---

[18] Movants suggest that because they are unnamed co-conspirators allegedly engaged in anti-competitive activity, there is no difference between them and CareCore and, thus, their market behavior is at issue. However, as non-parties, Movants' acquisition of other practices does not directly bear on how the Defendants behaved in the particular market at issue in these cases.

related to his client's transactional needs, and Movants' information was not provided in the context of Movants' relationship with CareCore.

Second, although CareCore may have been mentioned or discussed as part of the transactional work Weiss was doing, neither Movant suggests that Weiss warned them that their practices, by being affiliated with CareCore, were in danger of running afoul of the Sherman Act. In fact, Movants never aver that anti-trust concerns, market behavior, market structure, price fixing, or market power were ever issues raised or handled by Weiss as part of his transactional work for Movants. Thus, Weiss's work for Movants does not resemble Paul, Weiss's work in USFL.

Nonetheless, Movants argue that because a CareCore Provider's finances are relevant to CareCore's market power and market control, Weiss's prior knowledge of Movants' finances renders his prior work substantially related to the current cases. (See Movants' Reply, at 16.) However, Movants' argument reflects a misunderstanding of the substantial relationship test. For the issues to be identical or essentially the same, the same or similar issues must have been involved in the work Weiss did for Movants while he was representing them. See USFL 605 F. Supp. at 1460 (finding Paul, Weiss's work for the USFL substantially overlapped with the USFL's allegations against the NFL, and was directly relevant to causation and damages in the litigation). Because

35

neither Dr. Chang, nor Dr. Mendelsohn, suggests that confidential information was given to Weiss that had anything to do with market power, price fixing, or market control, the claim that Weiss had access to financial information is far too general to create a significant overlap with the issues in the current actions.

In addition, Weiss did not provide any legal services or advice that involved CareCore, nor did he advise Movants about their ownership of, or affiliation with, CareCore. Weiss did not even know that Movants were CareCore owners while he was actively representing them.

Even if the Court were to take a broader view of the facts and issues involved, the overlap between the prior and current representations is minimal. Movants point to the subpoenas served on them by Plaintiffs, and argue that the information sought in the subpoenas - including certain financial information and the degree to which CareCore affects Movants' finances - demonstrates why their finances are important to Plaintiffs' case. For example, in the subpoena issued to CPR, Document Request No. 9 seeks "all documents regarding any compensation or benefits to CP Radiology . . . in connection with its participation, in the ownership, management, or operation of CareCore. . . ." (Ex. A annexed to Chavkin Decl., at 13.)[19] A useful piece of information relevant to

---

[19] This document request is similar to Request Numbers 16, and 18, both of which deal with revenue or financial consequences to CRP/CPAI directly traceable to CareCore.

CareCore's market behavior and control would be the benefit its owners/members derive from CareCore, which is likely why Plaintiffs' subpoenas seek that information. (See Ex. A annexed to Chavkin Decl. at 13.) Both Movants assert that they gave Weiss information about how CareCore membership generally affected their financial condition. However, there is no evidence that they gave Weiss specific information showing CareCore's financial contribution to Movants' gross revenues, or that they described any additional revenue they obtained as a direct result of their CareCore ownership or membership. Movants do not even assert that such information exists. Finally, Weiss denies that any such information was ever made available to him, and that no such information is in his possession. (See Weiss Decl. ¶ 28.) Thus, Weiss had no information about how Movants' practices fit into CareCore's market structure, and he did not have access to information showing with particularity how CareCore membership or ownership affected Movants' practices.

Even if Movants' assertions about the information shared with Weiss are credited over Weiss's denials, Weiss only knew at a generalized level that "CareCore affected [Movants'] finances and its value. . . ." (Chang Decl. ¶ 15.) This general information is not confidential or detailed enough so as to substantially overlap with the specific anti-trust allegations asserted against CareCore by Plaintiffs.

In sum, the Court cannot conclude that the issues in Weiss's prior representation of Movants are the same or essentially the same as the issues in the current MDI action. See Team Obsolete Ltd. v. A.H.R.M.A. Ltd., No. 01 Civ. 1574 (ILG)(RML), 2006 WL 2013471, at *7 (July 18, 2006) (noting that information from prior representation with only "some relevance" to the current issue, is insufficient to "demonstrate an identity of issues"). Because there is only very limited factual overlap between Weiss's prior representation of Dr. Chang and Dr. Mendelsohn, and the current actions, the Court finds that there is not a substantial relationship between Weiss's prior representation of Movants and the current actions. See Nyquist, 590 F.2d at 1246 (declining to deal with ethical principles by "paint[ing] with broad strokes"); see also DeVittorio, 2007 WL 4372872, at *9 (declining to disqualify attorney even though there was a similar underlying issue and attorney had obtained some confidential information); Team Obsolete, 2006 WL2013471, at *8 (attorney not disqualified because movant failed to demonstrate identity of issues).

2.  Taint

Finally, although the lack of a substantial relationship between Weiss's prior representation and the current actions significantly reduces the risk of taint in this action, the question of taint is the ultimate question the Court must answer; it must, therefore, be addressed. See Nyquist, 590 F.2d at 1246;

<u>Occidental Hotels Management B.V. v. Westbrook Allegro L.L.C.</u>, 440 F. Supp. 2d 303, 309 (S.D.N.Y. 2006) (citing <u>Skidmore</u>, 2001 WL 504876, at *2).

Movants do not directly address in what ways Weiss's prior work would taint the current litigation. Rather, Movants appear to argue that there is a substantial relationship between the two, and therefore that relationship must naturally lead to taint.

The principle way in which the integrity of the adversary process can be undermined, in the context of a violation of Canon 4, is by the use of a former client's confidences to the new client's advantage. <u>See</u> <u>Nyquist</u>, 590 F.2d at 1246; <u>see also</u> <u>In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.</u>, 438 F. Supp. 2d 305, 307-08 (S.D.N.Y. 2006) (citing <u>Glueck</u>, 653 F.2d at 748); <u>In re Agent Orange Prod. Liab. Litig.</u>, 800 F.2d 14, 17 (2d Cir. 1986). Thus, it is only access to client communications, which threatens the integrity of the current litigation that warrants disqualification. <u>See</u> <u>Evans</u>, 715 F.2d at 791. If a party is capable of securing confidential information by means other than through prior representation, disqualification may not be merited, even if there is a technical violation of Canon 4. <u>See</u> <u>id.</u> at 793-94; <u>see also</u> <u>Skidmore</u>, 2001 WL 504876, at *4 (declining to disqualify even if facts learned as a result of prior representation were being used in the current representation). Therefore, not every ethical violation will necessarily lead to

disqualification.  See Hempstead Video, 409 F.3d at 132 (noting that ethical rules provide guidance, but that disqualification is only warranted where an attorney's conduct tends to taint the underlying trial).  The Court's concern, therefore is with taint which results in one side gaining an unfair advantage over the other.  See id. (citing Nyquest, 590 F.2d at 1246).

Here, there is no indication that Weiss had access to confidential information that would not otherwise be available through the discovery process.  The information about CareCore and its policies and procedures is neither privileged, nor confidential, and has been obtained from sources other than Movants.  Thus, it is difficult to see how W&Z would have an advantage that another firm representing Plaintiffs would not.

It is true that there is a possibility that Movants will be deposed and even cross-examined by their now-former attorneys.  Some of those questions could touch on matters which Weiss was vaguely aware of during his representation of Movants.  However, any privileged communications would remain protected by attorney-client privilege.  Any non-confidential information regarding Movants' businesses and their relationship with CareCore would be available to Plaintiffs regardless of who previously represented them.  The risk that an attorney may cross-examine a former client is not sufficient to disqualify an attorney.  See Skidmore, 2001 WL 504876, at *5 (finding no tangible prejudice that would result from

40

treating a former client as a hostile witness).

Furthermore, Movants have not pointed to any information, allegedly in Weiss's possession, which might lead to a request or question that would not have otherwise been advanced, but-for reliance on their confidences.[20] Movants have not demonstrated any way in which information allegedly learned by Weiss through his prior representation would provide some advantage to W&Z in this action. Absent a showing of how information could be used to Plaintiff's advantage, the Court cannot conclude that the possibility of being questioned by former counsel, while unusual, is sufficient to merit disqualification. See DeVittorio, 2007 WL 4372872, at *11 (declining to disqualify attorney, even though former client may be cross-examined by former counsel); Skidmore, 2001 WL 504876, at *5 (same).

Additionally, the Court sees no reason to disregard the assertions by Weiss that he does not recall receiving, and his notes do not reflect, that he obtained any significant information about CareCore or its affect on Movants' practices. See Team Obsolete, 2006 WL 2013471, at *7 (explicit statement that no confidences were ever received from the former client sufficient to rebut presumption that the attorney received client confidences).

---

[20] Notably, one of Movants' general objections to Plaintiffs' subpoenas is that "they seek documents containing information that Plaintiffs can obtain or have already obtained from Defendant CareCore National." (See Ex. A annexed to Chavkin Decl., at 5.)

Although Movants contradict Weiss's recollection, and argue that they in fact told him about CareCore, (see Chang Decl. ¶ 16; Mendelsohn Decl. ¶ 20), they go further and suggest that Weiss was fishing for inside information about CareCore for the purpose of bringing the Medscan action, and later the Alpha and MDI actions. (See Chang Decl. ¶ 16; Mendelsohn Decl. ¶ 25.) While the Court accepts the possibility that CareCore came up in conversation during Weiss's representation of Movants, there is no evidence whatsoever to support Movants' speculation that Weiss used his position as their former counsel to further the suits against Defendants.

Finally, even if there were some marginal benefit to Plaintiffs, derived from Weiss's prior representation of Movants, that benefit would not outweigh the substantial prejudice to MDI (and Park West) if the motion to disqualify were granted. See Team Obsolete, 2006 WL 2013471, at *8 (noting prejudice caused by disqualification was a reason to deny disqualification). Through the discovery process in this heavily contested, complex litigation, Plaintiffs' counsel has built up significant knowledge. New counsel would face a daunting task in having to become familiar with the facts of this case. As of the filing of this Opinion, nearly all the fact discovery has been completed, including very substantial document production and many of the critical depositions. The Court is unwilling to compromise Plaintiffs'

right to freely choose counsel and efficiently conduct this litigation on the basis of prior representation which, in this Court's view, will result in no taint to these proceedings. See Hempstead Video, 409 F.32d at 132 (noting courts must balance the plaintiffs' right to choose his counsel against the highest standards of the profession); see also In Re MTBE Litig., 438 F. Supp. 2d at 309 (denying motion to disqualify, finding no taint); Leber Assoc., 2001 WL 1568780, at *7 (denying motion to disqualify, noting that non-party status, plus no substantial relationship, did not justify disqualification).

The Court therefore finds no basis to disqualify W&Z. Absent any reason to disqualify W&Z, there is no taint imputed to S&T or Constantine.

## Conclusion

For the reasons set forth above, Movants' motions to intervene are granted and Movants' motions to disqualify Plaintiffs' counsel are denied. [Docket Entry 84 in 06 Civ. 7764; Docket Entry 86 in 06 Civ. 13516].

SO ORDERED.

Theodore H. Katz
United States Magistrate Judge

Dated:     March 25, 2008
           New York, New York

43